**No. 22-3140**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SEVENTH CIRCUIT

————————

UNITED STATES OF AMERICA,
*Plaintiff–Appellee,*

v.

THOMAS OSADZINSKI,
*Defendant–Appellant.*

————————

On Appeal from the United States District Court
for the Northern District of Illinois
No. 1:19-cr-869
Honorable Robert W. Gettleman

————————

**BRIEF OF AMICI CURIAE**
**AMERICAN CIVIL LIBERTIES UNION FOUNDATION &**
**AMERICAN CIVIL LIBERTIES UNION OF ILLINOIS**
**IN SUPPORT OF DEFENDANT–APPELLANT**

————————

Sarah Taitz
Brett Max Kaufman
Hina Shamsi
American Civil Liberties Union
  Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bkaufman@aclu.org

David Cole
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, D.C. 20005
dcole@aclu.org

Rebecca Glenberg
Roger Baldwin Foundation of
  ACLU, Inc.
150 N. Michigan Ave, Ste 600
Chicago, Illinois 60601
(312) 201-9740
rglenberg@aclu-il.org

*Counsel for amici curiae*

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3140

Short Caption: United States v. Thomas Osadzinski

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐    **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Civil Liberties Union Foundation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois (counsel for amici curiae)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _Brett_      Date: 5/9/2023

Attorney's Printed Name:  Brett Max Kaufman

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐    No ☑

Address:  American Civil Liberties Union Foundation

125 Broad Street, Floor 18, New York, NY 10004

Phone Number: (212) 549-2500      Fax Number:  (212) 549-2654

E-Mail Address: bkaufman@aclu.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3140

Short Caption: United States v. Thomas Osadzinski

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

        [ ]   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)     The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Civil Liberties Union Foundation

(2)     The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

American Civil Liberties Union Foundation, American Civil Liberties Union Foundation of Illinois (counsel for amici curiae)

(3)     If the party, amicus or intervenor is a corporation:

    i)     Identify all its parent corporations, if any; and

None

    ii)     list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)     Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)     Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: _Sarah Taitz_     Date: 5/9/2023

Attorney's Printed Name: Sarah Taitz

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes [ ]   No [✓]

Address: American Civil Liberties Union Foundation

125 Broad Street, Floor 18, New York, NY 10004

Phone Number: (212) 549-2500     Fax Number: (212) 549-2654

E-Mail Address: staitz@aclu.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3140

Short Caption: United States v. Thomas Osadzinski

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    American Civil Liberties Union Foundation

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois (counsel for amici curiae)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

    None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

    None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: _Hina Shamsi_      Date: 5/9/2023

Attorney's Printed Name: Hina Shamsi

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).     Yes ☐   No ☑

Address: American Civil Liberties Union Foundation

    125 Broad Street, Floor 18, New York, NY 10004

Phone Number: (212) 549-2500      Fax Number: (212) 549-2654

E-Mail Address: hshamsi@aclu.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3140

Short Caption: United States v. Thomas Osadzinski

   To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

   The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information.  The text of the statement must also be included in the front of the table of contents of the party's main brief.  **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

☐   **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)   The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate  disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

American Civil Liberties Union Foundation

(2)   The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois (counsel for amici curiae)

(3)   If the party, amicus or intervenor is a corporation:

   i)   Identify all its parent corporations, if any; and

None

   ii)   list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

None

(4)   Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

N/A

(5)   Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

N/A

Attorney's Signature: /s/ David Cole   Date: 5/9/2023

Attorney's Printed Name:  David Cole

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).   Yes ☐   No ☑

Address:  American Civil Liberties Union

   125 Broad Street, Floor 18, New York, NY 10004

Phone Number: (212) 549-2500   Fax Number:  (212) 549-2654

E-Mail Address: dcole@aclu.org

rev. 12/19 AK

**APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT**

Appellate Court No: 22-3140

Short Caption: United States v. Thomas Osadzinski

    To enable the judges to determine whether recusal is necessary or appropriate, an attorney for a non-governmental party, amicus curiae, intervenor or a private attorney representing a government party, must furnish a disclosure statement providing the following information in compliance with Circuit Rule 26.1 and Fed. R. App. P. 26.1.

    The Court prefers that the disclosure statements be filed immediately following docketing; but, the disclosure statement must be filed within 21 days of docketing or upon the filing of a motion, response, petition, or answer in this court, whichever occurs first. Attorneys are required to file an amended statement to reflect any material changes in the required information. The text of the statement must also be included in the front of the table of contents of the party's main brief. **Counsel is required to complete the entire statement and to use N/A for any information that is not applicable if this form is used.**

    ☐     **PLEASE CHECK HERE IF ANY INFORMATION ON THIS FORM IS NEW OR REVISED AND INDICATE WHICH INFORMATION IS NEW OR REVISED.**

(1)    The full name of every party that the attorney represents in the case (if the party is a corporation, you must provide the corporate disclosure information required by Fed. R. App. P. 26.1 by completing item #3):

    American Civil Liberties Union of Illinois

(2)    The names of all law firms whose partners or associates have appeared for the party in the case (including proceedings in the district court or before an administrative agency) or are expected to appear for the party in this court:

    American Civil Liberties Union Foundation, American Civil Liberties Union of Illinois (counsel for amici curiae)

(3)    If the party, amicus or intervenor is a corporation:

    i)    Identify all its parent corporations, if any; and

        None

    ii)    list any publicly held company that owns 10% or more of the party's, amicus' or intervenor's stock:

        None

(4)    Provide information required by FRAP 26.1(b) – Organizational Victims in Criminal Cases:

    N/A

(5)    Provide Debtor information required by FRAP 26.1 (c) 1 & 2:

    N/A

Attorney's Signature: /s/ Rebecca Glenberg      Date: 5/11/2023

Attorney's Printed Name: Rebecca Glenberg

Please indicate if you are *Counsel of Record* for the above listed parties pursuant to Circuit Rule 3(d).    Yes ☐   No ☑

Address: Roger Baldwin Foundation of ACLU, Inc.

    150 N. Michigan Ave, Ste 600, Chicago, Illinois 60601

Phone Number: (312) 201-9740      Fax Number:

E-Mail Address: rglenberg@aclu-il.org

rev. 12/19 AK

# TABLE OF CONTENTS

APPEARANCE & CIRCUIT RULE 26.1 DISCLOSURE STATEMENT ............... i

TABLE OF CONTENTS ........................................ vi

TABLE OF AUTHORITIES .................................... vii

STATEMENT OF INTEREST ................................... xi

INTRODUCTION & SUMMARY OF ARGUMENT ............................ 1

ARGUMENT ................................................ 4

I. Longstanding Supreme Court precedent imposes clear limits
on the government's authority to punish political advocacy and
association ............................................. 4

   A.    Under *Brandenburg*, the government may not criminalize
political advocacy unless it is intended and likely to incite imminent
lawless action. ...................................... 5

   B.    Under *Scales*, the government may not criminalize
association unless it involves active membership in a criminal
organization and the specific intent to further the organization's
unlawful goals ...................................... 9

   C.    *Humanitarian Law Project* narrowly permitted the
criminalization of the coordinated provision of training and
expert advice to a foreign terrorist organization, but expressly
preserved independent advocacy ........................ 12

II.   The defendant's conduct—viewing and sharing pro-ISIS
videos—is independent political advocacy protected by the
First Amendment ...................................... 15

   A.    Using technology to share a political message is First
Amendment–protected advocacy ....................... 15

   B.    Interpreting the term "coordination" in the material
support statute to encompass the independent dissemination
of ISIS propaganda would violate the First Amendment ........ 20

   C.    Because the defendant's conduct was not coordinated
within the meaning of *HLP*, *Brandenburg* and *Scales*
protect his speech .................................... 26

CONCLUSION ............................................ 27

# TABLE OF AUTHORITIES

**Cases**                                                                        **Page(s)**

*David v. Kazal*,
    142 S. Ct. 1674 (2022) ...............................................................................18

*ACLU of Ill. v. Alvarez*,
    679 F.3d 583 (7th Cir. 2012).................................................................17

*Am. Booksellers Ass'n, Inc. v. Hudnut*,
    771 F.2d 323 (7th Cir. 1985)....................................................................7

*Ashcroft v. Free Speech Coal.*,
    535 U.S. 234 (2002) ...............................................................................7, 8

*Boim v. Quranic Literacy Inst.*,
    291 F.3d 1000 (7th Cir. 2002)........................................................9, 11, 14

*Brandenburg v. Ohio*,
    395 U.S. 444 (1969) ...................................................................... *passim*

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011).................................................................................19

*Citizens United v. Fed. Election Comm'n*,
    558 U.S. 310 (2010). ...............................................................................17

*Collin v. Smith*,
    578 F.2d 1197 (7th Cir. 1978)................................................... 3, 7, 8, 27

*Communist Party of U.S. v. Subversive Activities Control Bd.*,
    367 U.S. 1, (1961) ................................................................................3, 8

*De Jonge v. Oregon*,
    299 U.S. 353 (1937) ..................................................................................8

*Elfbrandt v. Russell*,
    384 U.S. (1966) .......................................................................................11

*Hess v. Indiana*,
    414 U.S. 105 (1973) ..................................................................................8

*Holder v. Humanitarian Law Project*,
    561 U.S. 1 (2010) ........................................................................ *passim*

*Hudnut v. Am. Booksellers Ass'n, Inc.*,
    475 U.S. 1001 (1986) ................................................................... 7

*Joseph Burstyn, Inc. v. Wilson*,
    343 U.S. 495 (1952) ................................................................ 17, 19

*Junger v. Daley*,
    209 F.3d 481 (6th Cir. 2000) ..................................................... 19

*Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*,
    385 U.S. 589 (1967) .............................................................. 11, 12

*Martin v. City of Struthers*,
    319 U.S. 141 (1943) ................................................................ 18, 19

*NAACP v. Claiborne Hardware Co.*,
    458 U.S. 886 (1982). ............................................................. 11, 18

*Ness v. City of Bloomington*,
    11 F.4th 914 (8th Cir. 2021) ...................................................... 17

*Noto v. United States*,
    367 U.S. 290 (1961) ................................................................. 8, 10

*Packingham v. North Carolina*,
    582 U.S. 98 (2017) ...................................................................... 18

*Patriotic Veterans, Inc. v. Zoeller*,
    845 F.3d 303 (7th Cir. 2017) ...................................................... 19

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ...................................................................... 10

*Scales v. United States*,
    367 U.S. 203 (1961) .................................................................. *passim*

*Sharpe v. Winterville Police Dep't*,
    59 F.4th 681 (4th Cir. 2023) ....................................................... 17

*Texas v. Johnson,*
    491 U.S. 397 (1989) ................................................................................19

*Thunder Studios, Inc. v. Kazal,*
    13 F.4th 736 (9th Cir. 2021) ..............................................................18

*United States v. Dahlstrom,*
    713 F.2d 1423 (9th Cir. 1983).............................................................8

*United States v. Dellinger,*
    472 F.2d 340 (7th Cir. 1972)..............................................................11

*United States v. Farhane,*
    634 F.3d 127 (2d Cir. 2011)................................................................24

*United States v. Hassan,*
    742 F.3d 104 (4th Cir. 2014)..............................................................23

*United States v. Kaun,*
    827 F.2d 1144 (7th Cir. 1987)..............................................................8

*United States v. Mehanna,*
    735 F.3d 32 (1st Cir. 2013)................................................................24

*United States v. Mustafa,*
    406 F. App'x 526 (2d Cir. 2011).........................................................24

*United States v. Rahim,*
    860 F. App'x 47 (5th Cir. 2021).........................................................23

*United States v. Robel,*
    389 U.S. 258 (1967) ...............................................................8, 9, 10, 11

*United States v. Tounisi,*
    900 F.3d 982 (7th Cir. 2018).............................................................23

*United States v. Van Haften,*
    881 F.3d 543 (7th Cir. 2018).............................................................23

*United States v. Wright,*
    937 F.3d 8 (1st Cir. 2019) .......................................................... 23, 24

*Universal City Studios, Inc. v. Corley*,
  273 F.3d 429 (2d Cir. 2001)...................................................................... 18, 19, 20


**Statutes**

18 U.S.C. § 2339B ...............................................................................................1

50 U.S.C. § 781 ...................................................................................................3

Ohio Rev. Code Ann. § 2923.13 (1919).............................................................6

U.S. Const. amend. I ................................................................................. *passim*

## STATEMENT OF INTEREST

The American Civil Liberties Union ("ACLU") and the ACLU of Illinois are membership organizations dedicated to the principles of liberty and equality embodied in the constitutions and laws of the Commonwealth and the United States. Since its founding in 1920, the ACLU has frequently appeared before this Court and others, both as direct counsel and as amicus curiae, in numerous cases involving the First Amendment. In particular, the ACLU and its members have especially and long been concerned about efforts by the government to prohibit unpopular expression. The ACLU filed an amicus brief in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010).

All parties have consented to the filing of this brief.

## INTRODUCTION & SUMMARY OF ARGUMENT

This case involves the criminal conviction of a nineteen-year-old college student for providing material support to a terrorist organization. The defendant was not charged, much less convicted, of committing or attempting to commit any act of violence. He was not charged, much less convicted, of providing arms to a terrorist group, of joining or attempting to join such a group, or of providing or attempting to provide training or other resources to such a group. In fact, the defendant never had any contact with a terrorist group at all. Instead, he independently wrote a computer program to copy and reproduce publicly available, legally accessible videos that communicated support for ISIS. That independent advocacy is constitutionally protected under the First Amendment and is not a crime under the material support statute.

The government alleged that Thomas Osadzinski provided material support, in the form of "services," to ISIS, in violation of 18 U.S.C. § 2339B(a)(1). App. 1. The alleged "services" provided consisted of computer scripts that were designed to quickly copy, paste, and sort pro-ISIS and ISIS-produced videos between channels on the social media platform Telegram, in order to facilitate their dissemination. Gov't Resp. Pretrial Mots. at 17–18, *United States v. Osadzinski*, No. 1:19-CR-869 (N.D. Ill. June 28, 2021), ECF No. 85. He is also alleged to have added subtitles and voiceovers to some of the videos. *See* Trial Tr. (Vol. 7)

1338:14–18, 1339:4–6, *United States v. Osadzinski*, No. 1:19-CR-869 (N.D. Ill. Oct. 15, 2021), ECF No. 164.

The government did not allege that Mr. Osadzinski ever communicated with any member of ISIS, let alone that anyone connected to ISIS asked or instructed him to do what he did. *See* Def.'s Br. at 46–50. Rather, Mr. Osadzinski was prosecuted for attempting to share with others ISIS propaganda that he independently encountered online. His conduct was the modern-day equivalent of a person who, having read a pamphlet expressing Communist views, independently chose to print and distribute copies of the pamphlet to others.

As distasteful as the videos Mr. Osadzinski sought to disseminate are, his independent dissemination of them was constitutionally protected. The First Amendment imposes strict limits on the government's authority to punish political advocacy and association based on its alleged furtherance of illegal conduct. In *Brandenburg v. Ohio*, 395 U.S. 444 (1969), and *Scales v. United States*, 367 U.S. 203 (1961), in order to overcome First Amendment objections, the Supreme Court required the government to prove intentional and knowing incitement to imminent violence or active membership coupled with specific intent to do harm. These cases make clear that these requirements apply even when, as in *Brandenburg,* the speech urges racist violence, or, as in *Scales,* the alleged association is with a movement Congress found used terrorism and other illegal means to seek to

overthrow governments by force. *See Communist Party of U.S. v. Subversive Activities Control Bd.*, 367 U.S. 1, 5 (1961) (discussing findings about the "Communist movement" in the Subversive Activities Control Act of 1964, 50 U.S.C. § 781).

The Court's decision in *Holder v. Humanitarian Law Project* (*HLP*), 561 U.S. 1 (2010), did not call into question *Brandenburg* or *Scales. Id.* at 24–26. Instead, the Court rejected a pre-enforcement First Amendment challenge to the material support statute as applied to training and services to be provided directly to, and in coordination with, a foreign terrorist organization ("FTO"). But it was careful to make clear that the law did not prohibit *independent advocacy* of the sort at issue in this case. *Id.* Thus, absent proof that defendant's advocacy was coordinated with ISIS, or that he intended it to produce imminent lawless violence, it is protected by the First Amendment.

Like the Supreme Court in *Brandenburg* and *Scales*, this Court has not shied away from applying First Amendment protections to even the most offensive speech, most famously in the case of Nazis marching through the streets of Skokie, Illinois, a town that was home to many Holocaust survivors. *See Collin v. Smith*, 578 F.2d 1197  (7th Cir. 1978). This case presents another opportunity for the Court to make clear that the First Amendment protects all ideas and viewpoints—a promise lying at the heart of our constitutional system.

**ARGUMENT**

## I.  Longstanding Supreme Court precedent imposes clear limits on the government's authority to punish political advocacy and association.

Mr. Osadzinski was convicted for disseminating videos that promote ISIS ideas and celebrate terrorism. The videos promote illegal activity, and are deeply offensive. But the First Amendment protects the right of US persons to disseminate them, and to endorse their point of view—just as it protects the rights of Nazis to march in Skokie, of individuals to join the Communist Party, and of Klan leaders to engage in violent racist rhetoric. At the end of the day, Mr. Osadzinski was convicted for speech—and his conviction cannot survive application of First Amendment doctrine.

Political advocacy—including advocacy of violent or otherwise abhorrent causes—is core First Amendment speech protected from punishment except in narrow circumstances. The government may punish political advocacy only if it is intended and likely to incite imminent lawlessness. *Brandenburg*, 395 U.S. at 447. And the First Amendment protects political association, even with organizations that engage in illegal activity, absent "active membership" in an organization that engages in illegal activity and "specific intent" to further the organization's unlawful ends. *Scales*, 367 U.S. at 223, 230. These doctrines, developed in the wake of years of anti-anarchist and anti-communist censorship and guilt by association, ensure that Americans can advocate and associate freely, while

enabling law enforcement to protect the public from actual incitement and violence.

*Brandenburg* and *Scales* provide the First Amendment boundaries on criminalization of the type of speech at issue in this case: political advocacy espousing views parallel to those of a terrorist organization. In *HLP*, the Supreme Court did not disturb those baseline First Amendment protections. 561 U.S. at 31–32. It merely permitted the government to criminalize a specific and narrow category of *coordinated* speech: the provision of direct training and expert advice to a terrorist organization. The Court concluded that the government had a compelling interest in proscribing such speech. But critically, for purposes of this case, *HLP* specifically exempted independent advocacy from prosecution under the material support statute, and it thereby preserved the quintessentially American right to engage in controversial and unpopular political expression—even on topics such as terrorism.

A.     **Under *Brandenburg*, the government may not criminalize political advocacy unless it is intended and likely to incite imminent lawless action.**

In *Brandenburg*, the Supreme Court made clear that the First Amendment protects political advocacy—including advocacy of violence or other unlawful conduct—unless that advocacy is "directed to inciting or producing imminent lawless action and is likely to incite or produce such action." 395 U.S. at 447.

*Brandenburg* concerned a conviction under what today would be called an anti-terrorism statute. The Ohio Criminal Syndicalism Act punished persons who "'advocate or teach the duty, necessity, or propriety' of violence 'as a means of accomplishing industrial or political reform.'" *Id.* at 448 (quoting Ohio Rev. Code Ann. § 2923.13 (1919)). The Supreme Court held that the law was unconstitutional because it failed to distinguish between "mere advocacy" and "incitement to *imminent* lawless action." *Id.* at 449 (emphasis added).

While the *Brandenburg* principle has become a familiar one in the past half century, it is worth recalling its facts, which make clear that it is highly protective of even the most abhorrent speech. The defendant in *Brandenburg* was a Ku Klux Klan leader who had arranged for a local television station to cover a rural Ku Klux Klan rally. *Id.* at 444–45. The rally involved twelve hooded Klan members, several of whom were visibly carrying guns, burning a cross as they uttered racial slurs and other derogatory language. *Id.* at 445. Against this backdrop, the Klan leader gave a speech promoting the Klan and stating, "if our President, our Congress, our Supreme Court, continues to suppress the white, Caucasian race, it's possible that there might have to be some revengeance [sic] taken." *Id.* at 446. This inflammatory rhetoric was broadcast on television to a wide audience. *Id.* at 445.

Notwithstanding the reprehensible content of the speech at issue, the Supreme Court protected First Amendment freedoms, and not for the first or last

6

time. *See Am. Booksellers Ass'n, Inc. v. Hudnut*, 771 F.2d 323, 328 (7th Cir. 1985) (collecting cases protecting other abhorrent speech), *aff'd*, 475 U.S. 1001 (1986).

This Court has done the same. In 1977, after the Supreme Court vacated a state court injunction against a march by members of the Nazi party in the village of Skokie, the local government enacted three ordinances aimed at prohibiting the very same kind of march. *See Collin*, 578 F.2d at 1199. This Court held that the ordinances were unconstitutional, on their face and as applied. *Id.* at 1207. It explained that despite the "horrors associated with the Nazi regime," and the "certainty" that many people in Skokie (which has a large Jewish population) would "find the[] demonstration extremely mentally and emotionally disturbing"— even intentionally so—the ordinances could not survive First Amendment scrutiny. *Id.* at 1200. As the Court concluded, "[i]t is, after all, in part the fact that our constitutional system protects minorities unpopular at a particular time or place from governmental harassment and intimidation, that distinguishes life in this country from life under the Third Reich." *Id.* at 1201.

The *Brandenburg* doctrine closely guards the right to express unpopular viewpoints because "[t]he right to think is the beginning of freedom, and speech must be protected from the government because speech is the beginning of thought." *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 253 (2002). "The right to express any thought, free from government censorship" is essential "[t]o permit the

7

continued building of our politics and culture, and to assure self-fulfillment for each individual." *Collin*, 578 F.2d at 1202. This principle applies with particular force in the context of political advocacy, which "lies at the heart of the First Amendment." *See United States v. Kaun*, 827 F.2d 1144, 1151 (7th Cir. 1987).

Accordingly, the government is not permitted to assume that speech celebrating or advocating violence will in fact incite violence. The government cannot prohibit speech "because it increases the chance an unlawful act will be committed 'at some indefinite future time.'" *Free Speech Coal.*, 535 U.S. at 253 (quoting *Hess v. Indiana*, 414 U.S. 105, 108 (1973) (per curiam)). To do so would dangerously muddle the "vital distinctions between words and deeds, between ideas and conduct." *Id.* It is only when advocacy is both intended and likely to incite imminent violence that the speech itself can be punished.

There is no national security exception to *Brandenburg*'s incitement requirement. *See United States v. Dahlstrom*, 713 F.2d 1423, 1428 (9th Cir. 1983). Much of the Supreme Court's First Amendment doctrine arose in response to anti–Communist Party legislation aimed at protecting the nation's security from groups deemed an existential threat to the United States. *See*, *e.g.*, *Noto v. United States*, 367 U.S. 290, 296–99 (1961); *De Jonge v. Oregon*, 299 U.S. 353, 365 (1937); *United States v. Robel*, 389 U.S. 258, 264–68 (1967); *see also Communist Party of U.S.*, 367 at 5 (describing Congress's determination that the "Communist movement" used

terrorism and other illegal ends to seek to overthrow governments by force). Moreover, this Court has recognized that advocacy in support of terrorist organizations is protected speech, noting that individuals "may, with impunity, become members of Hamas, praise Hamas for its use of terrorism, and vigorously advocate the goals and philosophies of Hamas." *Boim v. Quranic Literacy Inst.*, 291 F.3d 1000, 1026 (7th Cir. 2002). As the Supreme Court has long recognized, "[i]mplicit in the term 'national defense' is the notion of defending those values and ideals which set this Nation apart." *Robel*, 389 U.S. at 264.

Absent a showing that Mr. Osadzinski's expression was intended and likely to incite imminent lawless conduct, it is protected by the First Amendment. The government's case below did not prove that his speech satisfies this high bar to prosecution.

## B. Under *Scales*, the government may not criminalize association unless it involves active membership in a criminal organization and the specific intent to further the organization's unlawful goals.

Mr. Osadzinski was convicted not just for the content of his expression, but on the ground that it supported ISIS, a designated terrorist organization. He is not alleged to be a member, or even to have communicated with anyone from ISIS, but absent the alleged connection of his speech to that group, that speech would not even arguably violate any federal law. In this sense, his conviction rests not just on the content of his speech, but also on its association with a proscribed group.

9

The First Amendment protects association with unpopular groups, even groups that use terrorism to target the United States. *See Scales*, 367 U.S. at 228–30. *Scales* concerned a federal statute that prohibited knowing membership in a group advocating the overthrow of the United States government—in effect, criminalizing Communist Party membership. *Id.* at 205. Driven by First Amendment concerns about "guilt by association," the Court interpreted the statute narrowly, requiring a showing that the defendant was an "active" member of the organization and possessed the "specific[] inten[t] to accomplish the aims of the organization by resort to violence." *Id.* at 222, 229 (cleaned up) (quoting *Noto*, 367 U.S. at 299); *see also Robel*, 389 U.S. at 262. Accordingly, the Court precluded conviction based on "merely an expression of sympathy with the alleged criminal enterprise, unaccompanied by any significant action in its support or any commitment to undertake such action." *Scales*, 367 U.S. at 228.

The active membership and specific intent requirements are essential to protecting the "First Amendment . . . right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984). The *Scales* Court was concerned that a "blanket prohibition of association with a group having both legal and illegal aims" would pose "a real danger that legitimate political expression or association would be impaired." *Scales*, 367 U.S. at 229. "Meticulous inquiry" into

the proof regarding a member's level of activity and specific intent is necessary "because of the real possibility in considering group activity, characteristic of political or social movements, of an unfair imputation of the intent or acts of some participants to all others." *United States v. Dellinger*, 472 F.2d 340, 392 (7th Cir. 1972). Simply put, the Constitution prohibits "guilt by association alone, without . . . [establishing] that an individual's association poses the threat feared by the Government in proscribing it." *Robel*, 389 U.S. at 265. This protection of freedom of association is so fundamental that the *Scales* requirements apply not just to criminal penalties, but to civil penalties as well. *See Keyishian v. Bd. of Regents of the Univ. of the State of N.Y.*, 385 U.S. 589, 607 (1967); *Elfbrandt v. Russell*, 384 U.S. 11, 16–17 (1966); *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886, 919 (1982).

As with *Brandenburg*, there is no national security exception to *Scales*; indeed, the test was forged in a national security case. That's why, as noted above, this Court has noted that a person may even "with impunity, become [a] member[] of [a terrorist organization]." *Boim*, 291 F.3d at 1026; *see id.* (contrasting Hamas membership and "vigorous[] advoca[cy for] the goals and philosophies of Hamas," which are constitutionally protected, with "provid[ing] weapons and explosives to terrorists" and "provid[ing] the resources with which the terrorists can purchase weapons and explosives"). And at a time when the Communist Party was seen as

posing a similarly grave threat to the nation's security, the Supreme Court explained that "[m]ere . . . membership, even with knowledge of the Party's unlawful goals, cannot suffice to justify criminal punishment." *Keyishian*, 385 U.S. at 607.

To the extent Mr. Osadzinski's conviction turns on his alleged association with ISIS, it cannot be squared with these fundamental First Amendment principles. The government has not even alleged that he is a member at all of ISIS, much less an "active member" with specific intent to further its illegal ends.

**C.** ***Humanitarian Law Project*** **narrowly permitted the criminalization of the coordinated provision of training and expert advice to a foreign terrorist organization, but expressly preserved independent advocacy.**

In *HLP*, the Supreme Court did not question the continued valence of *Brandenburg* or *Scales*, but upheld the material support statute as applied to the proposed provision of speech that directly trained, and provided expert advice and assistance to, designated foreign terrorist organizations, or FTOs. *HLP*, 561 U.S. at 7–11.[1] In the Court's view, the provision of that kind of speech could constitutionally constitute the kind of "service" criminalized by the statute because it was not mere political advocacy but a fungible resource offered directly to the

---

[1] There were two designated terrorist organizations at issue in *HLP*: the Kurdistan Workers' Party ("PKK") and the Liberation Tigers of Tamil Eelam ("LTTE"). 561 U.S. at 9.

designated organizations. *Id.* at 21–31. Nonetheless, the Court was careful to make clear the limits of its reasoning, specifically contrasting lawful and constitutionally protected "independent advocacy" with services "performed in coordination with, or at the direction of, a foreign terrorist organization." *Id.* at 24. Because Mr. Osadzinski's speech was independent advocacy, it cannot be punished under *HLP.*

    The proposed speech at issue in *HLP* involved not independent political advocacy, but the coordinated provision of other services: direct "training" of members of an FTO about topics like humanitarian and international law, "teach[ing]" members of an FTO "how to petition various representative bodies such as the United Nations for relief," "training" FTO members to petition international bodies for disaster aid, and "offering . . . legal expertise in negotiating peace agreements." *Id.* at 14–15 (cleaned up). As the Court explained, "[i]t is wholly foreseeable that the PKK could use the 'specific skill[s]' that plaintiffs propose to impart as part of a broader strategy to promote terrorism." *Id.* at 36–37. The Court noted the "real" possibility that "[t]he PKK could, for example, pursue peaceful negotiation as a means of buying time to recover from short-term setbacks, lulling opponents into complacency, and ultimately preparing for renewed attacks," and that "[a] foreign terrorist organization introduced to the structures of the international legal system might use the information to threaten, manipulate, and disrupt." *Id.* at 37; *see also id.* at 38 ("[T]raining and advising a

13

designated foreign terrorist organization on how to take advantage of international entities might benefit that organization in a way that facilitates its terrorist activities"). In short, the Court viewed the training the plaintiffs sought to provide as a fungible resource, resembling monetary contributions, made directly to and in coordination with an FTO. *See id.* at 37. The Court concluded that the government had a compelling interest in precluding such speech, and that the First Amendment permitted its criminalization.

The Court stressed the narrowness of its decision, and expressly declined to address whether "any future applications of the material-support statute to speech or advocacy [would] survive First Amendment scrutiny." *Id.* at 39. And most importantly for purposes of this case, the Court emphasized that as long as they were acting independently, and not in coordination with an FTO, "plaintiffs may say anything they wish on any topic," and "may speak and write freely about the PKK and LTTE, the Governments of Turkey and Sri Lanka, human rights, and international law." *Id.* at 25–26. The Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits [FTOs]." *Id.* at 39; *see also Boim*, 291 F.3d at 1026. Further, to the extent the plaintiffs challenged the application of the material support statute to their proposed political advocacy, the Court deemed it only as being "phrased at [too] high [a] level of generality" to "prevail in this

preenforcement challenge." *HLP*, 561 U.S. at 37–38. And it explained that the constitutionality of criminalizing even coordinated political advocacy would depend on the "expected level of coordination" with an FTO and the nature of the advocacy. *Id.* at 37.

Thus, by design, *HLP* does not apply to independent political advocacy in support of a terrorist group, even advocacy "that might be viewed as promoting the group's legitimacy." *Id.* at 32. Unlike the kind of coordinated training and expert advice provided directly to an FTO at issue in *HLP*, independent political advocacy is not a fungible "service" akin to financial contributions. It does not impart a skill that terrorist organizations may use to their benefit and it does not directly displace costs so as to effectively subsidize a terrorist organization's illegal efforts. *Id.* at 36–37. As the Supreme Court understood in limiting its decision, there is a significant difference between training a terrorist organization and independently expressing political views supportive of the organization—even where that expression somehow redounds to the general benefit of the organization's cause.

## II.     The defendant's conduct—viewing and sharing pro-ISIS videos—is independent political advocacy protected by the First Amendment.

### A.     Using technology to share a political message is First Amendment–protected advocacy.

In denying the defendant's motion to dismiss the indictment, the district court rejected his challenge under *Brandenburg* and held that *HLP* permitted his

prosecution. App. 57 (citing *HLP*, 561 U.S. at 26). The district court correctly understood that the defendant could not be prosecuted based on the "content" of any videos that he shared (including their message of support for ISIS). App. 7. But it erred in concluding that the speech at issue was not protected by *Brandenburg* and *Scales*.[2]

Mr. Osadzinski was convicted of material support based on his independent editing of a computer script to copy and forward videos depicting the violent aims and objectives of ISIS. Gov't Resp. Pretrial Mots. at 17–18, ECF No. 85. The videos themselves were not illegal contraband. *See* Def. Br. at 33. And the prosecution did not allege that the defendant ever communicated with ISIS or its members. *See* Def. Br. at 46–50. Nonetheless, the district court breezily concluded that this was not "mere[] praise" or "voicing support" for ISIS but a prohibited "service" under *HLP* because it "benefitted the FTO" with "scale and sophistication," which "transforms his conduct from an individual expressing an opinion, to providing a service to an FTO." App. 6–7 (cleaned up).

But in treating independent advocacy as a prohibited "service," the district court fundamentally erred in applying *HLP*. Where, as here, a person engages in

---

[2] In addressing the defendant's post-trial motion, the district court did not re-engage with the First Amendment issues in this case. *See* App. 31:6–8 ("I think this whole First Amendment defense is an important point for courts to consider, and I'm sure I'm not going to be the last judge to consider that point in this case.").

independent advocacy, the fact that the speech may praise or seek to disseminate the ideas of a terrorist group does not render that speech a crime. And the mere supposition that independent advocacy may generally benefit the group whose views are advocated does not transform constitutionally protected independent advocacy into unprotected speech or association.

As an initial matter, the defendant's composition of computer script to disseminate videos, translations, and voiceovers, were plainly protected by the First Amendment. The computer script was simply a means of transmitting ideas quickly. Limitations on "speech may operate at different points in the speech process." *Citizens United v. Fed. Election Comm'n*, 558 U.S. 310, 336 (2010). Taking a photograph, making a photocopy, scraping a public website, or financing a political advertisement are protected because they facilitate and are integral to speech in certain media. *See, e.g.*, *Sharpe v. Winterville Police Dep't*, 59 F.4th 674, 681 (4th Cir. 2023) (livestreaming police traffic stop); *Ness v. City of Bloomington*, 11 F.4th 914, 923 (8th Cir. 2021) (photography and recording in public). As this Court has explained, "[a]udio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are 'included within the free speech and free press guaranty of the First and Fourteenth Amendments.'" *ACLU of Ill. v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 502 (1952)). Using

17

technology to disseminate lawful videos is at the core of the First Amendment's protection.

Mr. Osadzinski's dissemination of pro-ISIS videos was an expression of his political views, no different from making a political speech to a crowd, passing out leaflets, re-tweeting a post, or forwarding an email with a political message. *See, e.g.*, *Claiborne Hardware Co.*, 458 U.S. at 928 ("An advocate must be free to stimulate his audience with spontaneous and emotional appeals for unity and action in a common cause."); *Martin v. City of Struthers*, 319 U.S. 141, 143 (1943) ("This freedom embraces the right to distribute literature . . . and necessarily protects the right to receive it."); *Thunder Studios, Inc. v. Kazal*, 13 F.4th 736, 745 (9th Cir. 2021) ("In general, emails and tweets, when published on the 'vast democratic forums of the Internet,' fall squarely within the protection of the First Amendment." (quoting *Packingham v. North Carolina*, 582 U.S. 98, 104, (2017)), *cert. denied sub nom. David v. Kazal*, 142 S. Ct. 1674 (2022). Computer script, like many other languages and forms of media, can be used to convey ideas—the core of First Amendment speech. "Instructions such as computer code, which are intended to be executable by a computer, will often convey information capable of comprehension and assessment by a human being." *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 448 (2d Cir. 2001). As the Second Circuit has explained, "[a] recipe is no less 'speech' because it calls for the use of an oven, and a musical

score is no less 'speech' because it specifies performance on an electric guitar." *Id.* at 447; *see Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) (similar). Similarly, this Court has treated another form of technology used to amplify messages— automated dialing machines, or "robocalls"—as speech. *See Patriotic Veterans, Inc. v. Zoeller*, 845 F.3d 303, 304 (7th Cir. 2017) (stating that a law that prohibited robocalls based on "message-based distinctions" would constitute "content discrimination prohibited by the First Amendment").

The district court ignored the basic fact that First Amendment speech can, and often does, involve the use of modern technologies in its conclusion that writing a computer script is categorically not protected as political speech, even when that is its purpose and communicative effect. The court concluded that the "scale and sophistication of this script transforms [Mr. Osadzinski's] conduct from an individual expressing an opinion, to providing a service to an FTO." App. 6. But because the defendant did no more than use the script to engage in independent advocacy, it is protected. The First Amendment protects the communication of ideas, regardless of how simple or sophisticated the medium of expression. It does not matter whether the medium is literature, *Martin*, 319 U.S. at 143, a film, *Joseph Burstyn, Inc.*, 343 U.S. at 503, video games, *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 790 (2011), the burning of a flag, *Texas v. Johnson*, 491 U.S. 397,

406 (1989), or computer script, *Corley*, 273 F.3d at 448. All of these forms of expression are protected when, as here, they express political messages.

### B.     Interpreting the term "coordination" in the material support statute to encompass the independent dissemination of ISIS propaganda would violate the First Amendment.

The district court concluded that Mr. Osadzinski's communications were not "independent" for two reasons: first, because "[h]e believed that" one of the FBI online covert employees ("OCE") he had spoken to, "OCE2," "was actually part of ISIS and sent him *Heralds* in an attempt to support ISIS"; and second, because ISIS had issued a general call for "media jihad," and Mr. Osadzinski's communications fell within that general term.[3] App. 31–32. But neither rationale supports a conclusion that defendant engaged in coordinated, as opposed to independent, advocacy. In fact, the record shows no actual or attempted coordination with ISIS. At most, the government showed that the defendant engaged in speech that supported the general strategy or tactics of ISIS. But that is not enough to constitute coordination for the purposes of the material support statute as construed in *HLP*.

---

[3] "OCE2" refers to one of four FBI online covert employees Mr. Osadzinski communicated with. *See* Def.'s Br. at 3, 9–10. "*Heralds*" refers to a political and religious manifesto written by Mr. Osadzinski that included computer scripts for copying and sorting videos. *See* App. 16–17.

First, there is no basis for the court's statement that Mr. Osadzinski "believed" that a government agent posing as a non-ISIS (and non-FTO) group member "was actually part of ISIS." App. 32:15–16. The record shows the opposite: OCE2 instead claimed to be associated with a non-FTO "pro-ISIS online publishing group." Trial Tr. (Vol. 1) 140:2–4, *United States v. Osadzinski*, No. 1:19-CR-869 (N.D. Ill. Oct. 5, 2021), ECF No. 158. The material support statute does not make it a crime to share a manifesto with anyone, or to provide support to a group that is not a designated foreign terrorist organization. Likewise, the record does not show that Mr. Osadzinski ever asked OCE2 or OCE4 (another government agent posing as a non-FTO, non-ISIS member) to provide his manifesto or his computer scripts to ISIS itself. Def. Br. at 49–51. Sharing a political advocacy document and computer script with ISIS sympathizers is First Amendment protected speech and does not provide a service to ISIS.

Second, the fact that Mr. Osadzinski disseminated propaganda videos after ISIS had issued a general call to engage in "media jihad" also does not constitute the kind of coordination that can be criminalized under *HLP*. The government's prosecution theory relied on a general call by ISIS, in an official video named "Inside 8," for supporters to upload ISIS-supportive videos in the face of social media platforms' efforts to take them down. Trial Tr. (Vol. 7) 1346–46, ECF No. 164. The court concluded that Mr. Osadzinski was "answering that call . . . [a]nd in

doing so, he was acting at ISIS's direction." App. 31:14–15. But engaging in speech that aligns with a terrorist group's broad strategy of *encouraging more supportive public speech*, especially without any contact with the group whatsoever, cannot satisfy *HLP*. The Supreme Court expressly emphasized that the *HLP* plaintiffs were free to "say anything they wish on any topic," including terrorist groups and the governments they oppose, as long as they acted independently, and not under the direction and control of the FTO itself. 561 U.S. at 25–26. Indeed, the Court cited the statute's exclusion of independent activity and the United States' representation that independent advocacy is not covered. *Id.* at 26 (quoting the government's brief's representation that "[t]he statute does not prohibit independent advocacy or expression of any kind"). The Court "in no way suggest[ed] that a regulation of independent speech would pass constitutional muster, even if the Government were to show that such speech benefits [FTOs]." *Id.* at 39. Thus, the Court made a sharp distinction between advocacy that is under the organization's direction and control, and independent advocacy. Just as writing an op-ed extolling Donald Trump's virtues after he issued a tweet urging supporters to do so would constitute independent advocacy, so the defendant's dissemination of his pro-ISIS ideas and computer script was independent advocacy, and not a service provided directly to ISIS, or under its direction and control.

In a similar case, the First Circuit rejected jury instructions that would have impermissibly left open for a jury to decide that a defendant was guilty of material support by merely showing his coordination "with the strategy [or] the tactics of the foreign terrorist organization," without a showing that the coordination occurred "with the organization itself." *United States v. Wright*, 937 F.3d 8, 29 (1st Cir. 2019) (emphasis removed). As the court explained, to hold otherwise would erroneously permit a material support conviction "based merely on a finding that the defendant had operated *in parallel* to that organization." *Id.* (emphasis added). That is precisely what occurred here.

While there have been many material support convictions, none has rested exclusively on independent political advocacy. *See United States v. Tounisi*, 900 F.3d 982, 984 (7th Cir. 2018) (defendant traveled abroad to join a terrorist group in Syria); *United States v. Van Haften*, 881 F.3d 543 (7th Cir. 2018) (similar); *United States v. Rahim*, 860 F. App'x 47, 53 (5th Cir. 2021) (defendant traveled to Jordan after creating and administering an online channel and repeatedly "attempted to provide personnel to ISIS" by "attempt[ing] to provide both himself and other individuals to work under ISIS's direction or control"); *United States v. Hassan*, 742 F.3d 104, 127 (4th Cir. 2014) ("[E]ach of the appellants travelled abroad seeking to reach locations considered to be jihadist battlefields, with the hope and intent of engaging in violent jihad. To prepare themselves for jihad, the appellants

trained with weapons . . . ."); *United States v. Mehanna*, 735 F.3d 32, 44 (1st Cir. 2013) ("[T]he defendant and his associates went abroad to enlist in a terrorist training camp."); *United States v. Farhane*, 634 F.3d 127, 134 (2d Cir. 2011) (defendant attempted to provide "medical support to wounded jihadists"); *United States v. Mustafa*, 406 F. App'x 526, 529 (2d Cir. 2011) (defendant "provided training in how to conduct violent jihad; . . . in how to modify an AK–47 to operate as a propelled grenade launcher, how to make a silencer, how to protect Islamic leaders from being shot, and how to slit throats").

Allowing the government to show "coordination" through independent speech activities merely because they followed a general public call for support would radically undercut the *HLP* Court's insistence on preserving the right to engage in independent advocacy. Under the theory supporting Mr. Osadzinski's conviction here, any pro-FTO idea expressed by a person who had viewed an FTO's propaganda could be deemed criminal material support merely because the FTO had generally encouraged supporters to engage in supportive speech, or because the person had utilized technology to independently and "in parallel," *Wright*, 937 F.3d at 29, advocate in favor of the FTO's goals. That is not remotely the kind of fungible, direct support that *HLP* declared unprotected. If it stands, the government's theory could sweep in a wide range of protected political advocacy—including the mere amplification of others' views (including retweets),

the publication of political manifestos or pamphlets, or artistic expressions that sympathize with or endorse an FTO's goals.

The government's broad definition of "coordination" has implications far beyond this case. On its theory, even academics studying FTOs or journalists reporting on FTOs might be deemed to have engaged in "coordinated" services if they publish FTO content. Indeed, below, the government's own expert witness testified that he had created a public online repository of ISIS videos, thereby making those videos more accessible to, and more likely to be viewed by, a wider audience. Trial Tr. (Vol. 4) 784:12–20, 840:16–841:10, *United States v. Osadzinski*, No. 1:19-CR-869 (N.D. Ill. Oct. 12, 2021), ECF No. 161.[4] Like Mr. Osadzinski, the expert made those videos available after ISIS had issued its general call for "media jihad." *See* Def. Br. at 41. Under the government's theory, that is sufficient to make the speech not "independent" and protected, but "coordinated" and a crime. Indeed, under this theory, the journalist who broadcast the *Brandenburg* defendant's KKK propaganda, 395 U.S. at 449, could also have been prosecuted without violating the First Amendment. The only distinction between Mr. Osadzinski's case and that of an academic or journalist is Mr. Osadzinski's

---

[4] Remarkably, unlike Mr. Osadzinski, the government's expert actually obtained videos directly from official ISIS channels. *See* Trial Tr. 841:13–18 (Vol. 4), ECF No. 161.

personal agreement with ISIS's cause. But that is not a permissible basis for punishing independent political advocacy under the First Amendment.

Illustratively, the district court defended its conclusion by explaining that "[t]his wasn't like going on a blog or Facebook or something like that and saying 'I love ISIS' or 'I love the Bears' or whatever it happens to be. He wasn't wearing an ISIS t-shirt." App. 31:24–32:2. But under the court's logic, if ISIS had called for supporters to fly the ISIS flag or wear ISIS t-shirts (rather than upload videos), anyone actually doing so *could* have been criminally liable for material support. The mere fact that ISIS had issued a generalized call for propaganda does not convert the independent advocacy of everyone who supports ISIS into the kind of coordination required under *HLP*—if it did, the space *HLP* explicitly left for independent advocacy would be nonexistent.

### C.     Because the defendant's conduct was not coordinated within the meaning of *HLP*, *Brandenburg* and *Scales* protect his speech.

As described above, the Supreme Court has set strict boundaries to prevent the punishment of unpopular speech and association. Because Mr. Osadzinski did not coordinate with an FTO within the meaning of *HLP*, his speech is entitled to those protections. It is unconstitutional to punish him for his speech unless it was intended and likely to incite imminent lawlessness, *see Brandenburg*, or he was an

active member of ISIS with specific intent to further its unlawful ends, *see Scales*, 367 U.S. at 203.

Mr. Osadzinski's conviction plainly does not survive the application of those tests. The speech he reproduced was not even arguably close to *Brandenburg*'s line of imminent violence. And the government makes no claim that defendant is an active member of ISIS. As such, the government has no legal grounds to prosecute him for his speech, and it sets a dangerous precedent by doing so. Scrupulous application of First Amendment principles is necessary to protect against punishment of individual political expression and beliefs—a process that inevitably targets and chills the expression of minority viewpoints. As this Court has written, it is precisely when minority views are most unpopular that the First Amendment demands their most careful protection. *Collin*, 578 F.2d at 1200–01.

## CONCLUSION

Because the defendant's proven conduct does not fall within *HLP* and constitutes independent First Amendment–protected political advocacy, the Court should reverse his conviction.

DATE: May 12, 2023

Respectfully submitted,

/s/ *Rebecca Glenberg*
Rebecca Glenberg
Roger Baldwin Foundation of
ACLU, Inc.
150 N. Michigan Ave, Ste 600
Chicago, Illinois 60601
(312) 201-9740
rglenberg@aclu-il.org

Sarah Taitz
Brett Max Kaufman
Hina Shamsi
American Civil Liberties Union
Foundation
125 Broad Street, 18th Floor
New York, New York 10004
(212) 549-2500
bkaufman@aclu.org

David Cole
American Civil Liberties Union
Foundation
915 15th Street, NW
Washington, D.C. 20005
dcole@aclu.org

*Counsel for amici curiae*

## CERTIFICATE OF COMPLIANCE

The undersigned, counsel for the amicus curiae ACLU of Illinois, hereby certifies that this brief contains 6,550 words from the Statement of Interest through the Conclusion, and thereby complies with Circuit Rule 29. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because Microsoft Word was used to prepare the brief and the font style is Times New Roman with a 14-point size of type.

/s/ *Rebecca Glenberg*
Rebecca Glenberg

## CERTIFICATE OF SERVICE

I hereby certify that on May 12, 2023, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit by using the CM/ECF system. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Rebecca Glenberg*
Rebecca Glenberg