In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

No. 22-3140

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

THOMAS OSADZINSKI,

*Defendant-Appellant.*

———————————

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 1:19-cr-00869-1 — **Robert W. Gettleman**, *Judge.*

———————————

ARGUED JANUARY 8, 2024 — DECIDED MARCH 28, 2024

———————————

Before WOOD, SCUDDER, and ST. EVE, *Circuit Judges.*

SCUDDER, *Circuit Judge.* Thomas Osadzinski appeals his conviction for providing material support to a terrorist organization. In 2019 he created a computer program that allowed ISIS (the Islamic State in Iraq and Syria) and its followers to rapidly duplicate terrorist propaganda videos online and thereby to stay a step ahead of efforts by the United States and other western governments to thwart the organization's media campaign. Osadzinski shared his computer program with

people he believed were ISIS supporters, taught them how to use it, and deployed it to compile and disseminate a large trove of ISIS media.

Osadzinski claims that his conviction violated the First Amendment because his actions constituted independent free expression. Alternatively, he contends that he lacked fair notice that his offense conduct violated the material-support statute, 18 U.S.C. § 2339B. He further argues that the evidence the government presented at his trial was insufficient to support his conviction. We disagree on all fronts. Applying the guidance the Supreme Court supplied in *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010), we conclude that, to the extent that Osadzinski engaged in expressive activity, the activity was coordinated with or directed by ISIS, a known terrorist organization. That leads us to affirm.

**I**

A

In February 2018 the Federal Bureau of Investigation received a tip about Thomas Osadzinski, an undergraduate student studying computer science in Chicago, Illinois. The tipster reported that Osadzinski had become obsessed with ISIS propaganda and was in regular online communication with extremists.

The tip proved accurate. On June 6, 2018, an anonymous user—later identified as Osadzinski—posted a screenshot of instructions for manufacturing a homemade explosive device in a pro-ISIS online forum called "weapons." The screenshot described the instructions as "a gift to the mujahideen who operate in [infidel] lands" so that they "might strike a blow behind the enemy lines, like we did in Paris"—a reference to

ISIS bombings and shootings in France in November 2015 that killed 130 people and injured hundreds more.

An undercover FBI operative—whom we refer to as Agent 1—saw Osadzinski's post and initiated a conversation. Posing as a fellow ISIS supporter in the Middle East, Agent 1 offered to connect Osadzinski to members of the Islamic State. Osadzinski replied, "If you trust the brothers sure send [] them my way." Osadzinski shared that he was attending "a top school for computers" and "can help many brothers." Later he reiterated the same point in more direct terms: "If any brothers need help with security tell them to come to me."

Three weeks passed. At the end of June 2018, Agent 1 checked back in. Osadzinski reacted by apologizing, saying he had to "stay passive for now" and could not contact ISIS members because he believed the FBI was surveilling him. But he reaffirmed his commitment to the broader ISIS cause, pledging that "if i must i will attain shahadah [martyrdom]."

These communications caused the FBI to enhance their surveillance of Osadzinski. In February 2019 the Bureau sent a second undercover agent to visit his classroom and pretend to be a representative from a software company. Agent 2 selected Osadzinski to test a new antivirus program in exchange for $1,000. After several meetings, he confided in Osadzinski that he too supported ISIS, and the two developed a friendship of sorts.

That same month Osadzinski contacted a third agent who he believed to represent another ISIS-aligned online group. Osadzinski shared several of his projects with Agent 3, including an article he had written for a pro-ISIS youth magazine, two ISIS propaganda videos to which he had

contributed English subtitles, and a third ISIS video that he had narrated. Agent 3 asked Osadzinski whether he was doing this to support the Islamic State or for jihad. "[B]oth," Osadzinski responded.

In March 2019 Agent 3 sent Osadzinski a report indicating the number of social media accounts that had been removed from online platforms due to terrorism-related content. The two denounced western governments' efforts to suppress and censor ISIS's message. Osadzinski then asked Agent 3 if he had seen a video called Inside 8.

Inside 8 is an ISIS propaganda video that calls on support-ers to help maintain and magnify the group's presence online. The video depicts ISIS operatives hunched over computer screens writing code while images of explosions flash and a nasheed rings out in the background. All the while, a narrator laments that the United States has "beguiled the people for so many years by monopolizing the media and using it to spread its false notion of invincibility." The narrator urges viewers to "support your khilafah on the digital front" by "amplif[ying]" ISIS's call, "adopt[ing] the messaging put out by its official media," and "striv[ing] to disseminate it far and wide." The film then proclaims a call to action:

> [S]trive patiently in the digital arena, and do not allow the disbelievers to enjoy a moment of sleep or to live a pleasant life. If they close one account, open another three. And if they close three, open another 30. … For with every press of a key on the keyboard, you amplify the force and reach of the explosives. And with every click of a mouse and every piece of content you

disseminate, … your support enrages the disbe-
lievers.

Echoing Inside 8's primary message, Osadzinski told
Agent 3: "[If] they delete 1[,] we make 2 more." He then
informed Agent 3 that he had learned a computer technique
that would enable the rapid duplication of ISIS media files on
the social media platform Telegram.

In April 2019 Agent 3 introduced Osadzinski to a fourth
undercover colleague who claimed to be a radical ISIS sup-
porter in need of translation assistance to conduct a bomb at-
tack. While Osadzinski did not ultimately provide that trans-
lation, he did tell Agent 4 that he was working on several
computer projects to help fellow supporters avoid surveil-
lance. "I love learning about computers" he expressed,
"theyre very useful for jihad."

In August 2019 Agent 3 asked Osadzinski about his
progress. Osadzinski replied by sending screenshots of his
computer code, along with both a pro-ISIS Telegram channel
that his code was duplicating in real time and a large offline
database of ISIS media files. Osadzinski explained that he had
created a custom software program that automatically copied,
organized, and distributed ISIS videos housed on Telegram.
He then emphasized that this was only "one small section" of
what he was working on and that he intended to expand his
archive—which already contained 3,762 items—to include all
content released by ISIS. Osadzinski told Agent 3 that his ul-
timate objective was to "spread it everywhere."

To disseminate his collection of ISIS media without detec-
tion, Osadzinski planned to convert his offline archive into a
torrent file—which can be simultaneously downloaded from

multiple servers at once to boost transmission speeds and obscure file origins. He told Agent 3 that he then intended to publicly broadcast the link, effectively creating a permanent archive that "nobody can take … down." Western intelligence agencies, Osadzinski boasted, would only be able to "watch" as "the media jihad will never end."

By the summer of 2019 Osadzinski had set to work executing his plan. In August he instructed Agent 3 to share his Telegram channel "with anyone you trust." He also sent the channel to Agent 2, instructing him to do the same. In October 2019 Osadzinski reached out to a fifth undercover operative, believing him to be a representative of an organization that translated official ISIS publications into English. Introducing himself as a "munasir" (ISIS supporter) who "copies channels," Osadzinski shared a screenshot of a Telegram channel he had created using his code with over 17,000 ISIS media files.

Meanwhile, Osadzinski taught his computer program to other ISIS supporters. For several hours over multiple days, he instructed Agent 5 on the details of how to run his computer script. He did the same for Agent 2. During an in-person meeting on October 10, 2019, Agent 2 asked Osadzinski if he could "walk me through [the program] step by step" so Agent 2 could "take a screenshot" and "translate it for the brothers in dawla [ISIS]." "I'll show you how," Osadzinski agreed. He then provided detailed instructions showing Agent 2 how to run the code, download its accompanying software, and troubleshoot the program.

Osadzinski still was not done. To expand access to his program to an even broader audience of ISIS supporters, he wrote an instructional document called Heralds of the

Internet. Heralds consisted of step-by-step directions on how to organize online ISIS content using Osadzinski's program, with each step accompanied by screenshots of the necessary source code. Osadzinski shared the document with Agent 3 in August 2019. He also told Agent 3 that he planned to write another instruction manual teaching "brothers" how to copy channels on Android devices.

Osadzinski never got the chance. On November 18, 2019, Agent 2 arranged a final meeting with him at a hotel room in Chicago, during which FBI agents arrested and took Osadzinski into custody.

B

A month later a federal grand jury charged Osadzinski with one count of knowingly attempting to provide material support to a foreign terrorist organization by providing services to ISIS in violation of 18 U.S.C. § 2339B.

Osadzinski moved to dismiss the indictment, arguing that the charge was unconstitutionally vague because he lacked fair notice that "downloading pro-ISIS media for personal viewing and for potentially sharing with others online" might qualify as a "service" to a terrorist organization under § 2339B. He also claimed that the application of § 2339B to his conduct violated the First Amendment because he had engaged only in protected expressive activity.

The government responded by proffering more details on the nature of the services that Osadzinski had been indicted for providing in support of ISIS. It described those services as:

> [T]he creation or modification of [computer] code, the establishment of Telegram channels in which to utilize the code, the distribution of the

> code to others in order to spread the ability to
> preserve ISIS videos, and efforts to divert law
> enforcement's attention in order to protect the
> code and the Telegram channels from law en-
> forcement interference.

The district court denied Osadzinski's motion. The court concluded that the indictment, when considered in light of the government's bill of particulars, provided Osadzinski with sufficient notice of the conduct for which he was being prosecuted. Applying the Supreme Court's decision in *Holder v. Humanitarian Law Project* (*HLP*), the district court further determined that Osadzinski—having developed his propaganda-duplicating computer code in coordination with and at the direction of ISIS—was not being prosecuted for expressive activity shielded by the First Amendment.

The case then proceeded to trial. Over seven days, the government presented testimony from the five undercover FBI operatives, an ISIS expert, and a computer science specialist. Through those witnesses, the government introduced multiple pieces of evidence, including screenshots of Osadzinski's online communications with agents, recordings of his conversations with Agent 2, clips from ISIS videos found in his possession, documents and other items obtained from his residence, and copies of his computer script. Osadzinski, as was his right, presented no defense case.

The district court instructed the jury that, to find Osadzinski guilty of violating 18 U.S.C. § 2339B, it needed to find beyond a reasonable doubt that he had "knowingly attempted to provide material support or resources" to ISIS in the form of "services." The district court then provided the following instruction:

> The term "services" refers to concerted activity, not independent activity. Services provided as material support to a foreign terrorist organization include[] advocacy or activity performed in coordination with, or at the direction of, a foreign terrorist organization. Independent activity or advocacy, however, is not prohibited.

At Osadzinski's request, the district court further emphasized to the jury that nothing in the material-support statute "abridge[s] the exercise of rights guaranteed under the First Amendment" and, for that reason, "[a]dvocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute."

The jury returned a verdict of guilty. Osadzinski moved for acquittal and alternatively for a new trial, challenging the sufficiency of the government's evidence. The district court denied the motions, explaining that the government had presented ample evidence to permit the jury to find that Osadzinski had knowingly attempted to engage in concerted activity with ISIS to provide it with material support. The district court sentenced Osadzinski to 90 months' imprisonment, below the advisory U.S. Sentencing Guidelines term of 240 months.

Osadzinski appealed, reiterating his First Amendment, unconstitutional vagueness, and sufficiency-of-the-evidence challenges.

## II

Osadzinski's First Amendment and constitutional vagueness challenges significantly merge and overlap. Both flow from the same root contention that his conduct consisted

entirely of constitutionally protected independent advocacy. We reject that contention, addressing each argument in turn.

A

We begin with the material support statute. By its terms, 18 U.S.C. § 2339B makes it a crime to "knowingly provid[e] material support or resources to a foreign terrorist organization." Congress defined "material support or resources" as "any property, tangible or intangible, or service." 18 U.S.C. § 2339A(b)(1); see also *id.* § 2339B(g)(4). "Services" include any "expert advice or assistance" that is "derived from scientific, technical or other specialized knowledge." *Id.* § 2339A(b)(1), (3).

The provision of material support must be "knowing"—meaning a defendant must have "knowledge that the organization is a designated terrorist organization" or otherwise "engages in terrorism" or "terrorist activity." *Id.* § 2339B(a)(1). Section 2339B does not require that support actually reach a terrorist organization, however. The statute also prohibits "attempt[ing]" to provide material support. *Id.* A defendant "attempts" to commit a crime by taking a substantial step towards its completion with the specific intent to follow through. See *United States v. Resendiz-Ponce*, 549 U.S. 102, 106–07 (2007).

Section 2339B contains a constitutional savings clause: "Nothing in this section shall be construed or applied so as to abridge the exercise of rights guaranteed under the First Amendment to the [U.S.] Constitution." *Id.* § 2339B(i). Applying that clause, the Supreme Court in *HLP* explained that § 2339B did not prevent a person from freely speaking about, or even independently advocating for, a terrorist

organization. See 561 U.S. at 24; see also *Boim v. Quranic Literacy Inst. and Holy Land Found. for Relief and Dev.*, 291 F.3d 1000, 1026 (7th Cir. 2002) (emphasizing the same point). Rather, the Court made clear that the material-support statute prohibited "only a narrow category of speech" that falls outside the protection of the First Amendment—speech "to, under the direction of, or in coordination with foreign groups that the speaker knows to be terrorist organizations." 561 U.S. at 26.

## B

Drawing on *HLP*, Osadzinski claims that his conviction violated the First Amendment. He insists that the "services" he allegedly provided ISIS consisted entirely of constitutionally protected free expression. Allowing his conviction to stand based on mere independent advocacy, he contends, would violate the Free Speech Clause.

For the sake of resolving this appeal, we accept Osadzinski's contention that all of his offense conduct qualifies as "speech" within the meaning of the First Amendment. That includes several activities that have been recognized as expression, such as writing an article and instruction manual, forwarding multimedia links, and sending pro-ISIS messages over social media. See *Packingham v. North Carolina*, 582 U.S. 98, 104–05, 108 (2017) (recognizing in a different context that a person's First Amendment right to "access [] places where they can speak and listen" extends to social media). It also includes Osadzinski's creation, execution, and distribution of source code, which other circuits have found to constitute "speech" under the First Amendment. See, *e.g.*, *Junger v. Daley*, 209 F.3d 481, 485 (6th Cir. 2000) (holding that source code at a minimum is protected by the First Amendment); *Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 445–452 (2d

Cir. 2001) (holding that both object and source code qualify as speech but that regulations thereof are content neutral so long as they target only functional "nonspeech elements").

This case does not require us to articulate the precise contours of the First Amendment's relationship with computer code. The government appears to concede that all of Osadzinski's relevant conduct constitutes speech. We are comfortable, therefore, assuming without definitively deciding that Osadzinski's offense conduct consisted entirely of expressive activity within the meaning of the First Amendment.

That observation does not end our analysis, however. To say that Osadzinski engaged in expressive activity is not the same as concluding that the First Amendment protected the activity without qualification. The law has long recognized that, in limited circumstances, speech may lose its full measure of constitutional protection and indeed violate the law. See *United States v. Stevens*, 559 U.S. 460, 468 (2010) (explaining that "[f]rom 1791 to the present, … the First Amendment has permitted restrictions upon the content of speech in a few limited areas" (cleaned up)); see also Eugene Volokh, *Crime-Facilitating Speech*, 57 STAN. L. REV. 1095, 1132–36 (2005) (illustrating the difficulty of determining what categories of expression should be subject to content-based restrictions through the example of crime-facilitating speech). Take, for example, incitements designed and likely to "produc[e] imminent lawless action," which the Supreme Court declined to shield from content-based restrictions in *Brandenburg v. Ohio*, 395 U.S. 444, 447–48 (1969). Or consider "true threats" of violence, which the Court likewise held to be a less protected category of speech in *Watts v. United States*, 394 U.S. 705, 708 (1969); see also *Virginia v. Black*, 538 U.S. 343, 359 (2003)

(reiterating that the First Amendment does not fully protect "true threats"—"statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals").

The Supreme Court's decision in *HLP* grounded itself in these principles. The Court in no way questioned the right to independently express personal views—positive, negative, or neutral—about terrorist organizations. But it was equally clear that the right has limits. One such limit is Congress's authority to prohibit expressive activity that amounts to the provision of material support to a foreign terrorist organization where the support is either addressed to, directed by, or coordinated with that organization. See *HLP*, 561 U.S. at 26.

The jury found that Osadzinski had acted in coordination with or under the direction of ISIS—which *HLP* determined to fall outside the protection of the First Amendment. The point is not subject to doubt, as the district court took care to instruct the jurors not to return a guilty verdict unless they concluded beyond a reasonable doubt that Osadzinski had knowingly acted "in coordination with, or at the direction of, a foreign terrorist organization." The court further explained that "[i]ndependent activity or advocacy [] is not prohibited" and, in case any doubt remained, doubled down in a separate instruction: "Advocacy that is done independently of the terrorist organization and not at its direction or in coordination with it does not violate the statute." In returning its verdict, the jury necessarily found that Osadzinski engaged in unprotected expressive activity in concert with ISIS. On this record, and having conducted our own independent legal review of Osadzinski's legal claims, we agree with the district court that

Osadzinski's material-support conviction did not offend the First Amendment.

Joined by amicus, Osadzinski presses an even broader legal point. He objects that affirming his conviction would all but eliminate the constitutional right to independently advocate for a terrorist organization. Osadzinski highlights that, if a group's general call for support is enough to constitute "direction" under *HLP*, then anyone who watches a video like Inside 8 would subsequently be barred from engaging in core First Amendment activity—viewing and sharing others' viewpoints—simply because the terrorist group asks its supporters to do so.

Osadzinski is right on a broad level. Any holding that would eliminate—explicitly or otherwise—a person's right to engage in independent advocacy for a terrorist organization would conflict with long-recognized constitutional principles. We have observed that section 2339B does not prohibit persons from expressing sympathy for the views of a foreign terrorist organization. See *Boim*, 291 F.3d at 1026. We reject any interpretation of "coordination" or "direction" that would prohibit expressive activity aligned with that view.

But Osadzinski's baseline assumption is mistaken. He was not convicted simply for watching Inside 8 and subsequently engaging in what would otherwise constitute independent advocacy. Far from it. At every step, Osadzinski closely coordinated his activity with ISIS and its media office by contributing to official videos and providing them with a software tool to organize, duplicate, and disseminate media to a wider audience while circumventing censors. Our affirming his conviction respects these legal lines.

C

Osadzinski brings a separate but related legal challenge, invoking the Due Process Clause of the Fifth Amendment and contending that § 2339B was unconstitutionally vague as applied to his offense conduct. He acknowledges that the Supreme Court in *HLP* rejected a similar vagueness challenge, holding that § 2339B clearly barred nonprofits from advising terrorist organizations on international law. See 561 U.S. at 21–22. But he argues that, while § 2339B certainly has some clear applications, the statute is vague regarding whether it extends to his particular offense conduct. Put another way, Osadzinski insists that he lacked reasonable notice that his specific actions might constitute "services" to ISIS as that term is used in § 2339B.

"A conviction fails to comport with due process if the statute under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The "touchstone" of fair notice "is whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *United States v. Lanier*, 520 U.S. 259, 267 (1997).

When a statute "interferes with the right of free speech or of association, a more stringent vagueness test should apply." *Vill. of Hoffman Estates v. Flipside, Hoffman Estates, Inc.*, 455 U.S. 489, 499 (1982). Yet "perfect clarity and precise guidance have never been required." *Williams*, 553 U.S. at 304 (internal quotation marks omitted). So long as a statute "clearly proscribe[s]" a defendant's conduct, it is not unconstitutionally vague, even to the extent a heightened standard may

apply. See *HLP*, 561 U.S. at 20 (citing and relying on the reasoning of *Hoffman Estates*).

When assessing a vagueness challenge to a criminal conviction, we construe the defendant's conduct in light of "[t]he trial record, read most favorably to the jury's verdict." See *Lanier*, 520 U.S. at 261. Here, the record makes clear that Osadzinski engaged in conduct "clearly proscribed" by § 2339B. For that reason, his vagueness challenge fails.

We have no difficulty concluding that Osadzinski's actions qualified as a "service" that materially supported ISIS. See 18 U.S.C. § 2339A(b)(1). Recall that the statute defines "service" to include "expert advice or assistance" "derived from scientific, technical or other specialized knowledge." *Id.* § 2339A(b)(1), (3). Osadzinski provided exactly that. He used his computer training to create and deploy a computer script that duplicated troves of ISIS propaganda to circumvent the censorship of ISIS media online. He then instructed other ISIS supporters on how to use the script to achieve the same objective. In doing so, he provided material support to ISIS (and its media campaign) within the meaning of § 2339B.

The trial evidence shows beyond any dispute that Osadzinski performed these actions "knowingly"—fully understanding that ISIS "has engaged or engages in terrorist activity." *Id.* § 2339B(a)(1). In scores of communications with the undercover FBI operatives, Osadzinski demonstrated an awareness of ISIS's mission and violent terrorist activities. In one exchange, he sent Agent 3 an official ISIS video that culminated in a montage of beheadings and commented, "the end is the best." We need say no more on this point.

Osadzinski emphasizes that the term "service" in § 2339B, as construed in *HLP*, extends only to concerted speech activity—that which is addressed to, coordinated with, or directed by ISIS. Again, we accept Osadzinski's base assumption that his offense conduct entailed expressive activity. We nonetheless conclude that his conduct unambiguously qualifies as concerted activity.

*HLP* did not present the Supreme Court with an occasion to drill down into how much "coordination" or "direction" is required to amount to the provision of "services" within the meaning of § 2339B. See 561 U.S. at 25 (holding that "gradations of fact or charge would make a difference as to criminal liability, and so adjudication of the reach [of § 2339B] must await a concrete fact situation" (cleaned up)). The line dividing concerted conduct from independent advocacy will doubtless emerge as courts continue to consider challenges to convictions under § 2339B. We need only decide whether Osadzinski's conduct clearly falls on the proscribed side of that line.

It did. Osadzinski acted in response to what he perceived to be a solemn directive from ISIS contained in the Inside 8 video: "Support your khilafah on the digital front" by "adopt[ing] the messaging put out by its official media," and "striv[ing] to disseminate it far and wide." In discussions with the undercover law enforcement agents, he explicitly referenced Inside 8's directive: "[I]f they close one account, open another three. And if they close three, open another 30." And he sought to do just that.

For months, Osadzinski labored diligently to answer ISIS's call for help in waging its media campaign. He assisted ISIS's media offices by contributing English subtitles and a

voiceover to their videos. He compiled and organized a massive database of high-resolution ISIS videos for future distribution. He designed a program to automatically organize and multiply ISIS content online. And he taught fellow ISIS supporters how to do the same, spending hours over several days to assist with troubleshooting. Through these actions, Osadzinski propelled himself far beyond the role of an independent advocate, effectively fusing his voice with that of ISIS's media bureaus by improving, contributing to, compiling, organizing, and designing a tool to explosively distribute their official publications.

Throughout, Osadzinski coordinated his actions—or, at the very least, attempted to coordinate them—with ISIS members. At least twice he reiterated to Agent 3, "[i]f any brothers need help with security, tell them to come to me." When Agent 1 offered to put Osadzinski in touch with ISIS's official media bureau, he replied that he hoped to do so "in the near future." He later invited Agent 3 to share his ISIS media channels with "anyone [he] trusted." When Agent 2 requested guidance on how to run the computer program that he could take back to ISIS members, Osadzinski did not hesitate. He even wrote a step-by-step instructional guide for any ISIS follower to use.

Osadzinski planned to go even further. He explained to Agent 3 that he intended to convert his comprehensive archive of ISIS videos into a torrent that could be spread widely with minimal risk of censorship. He even suggested working in tandem with ISIS's official media bureaus to help them organize their online content. Through the dissemination and deployment of his code, Osadzinski hoped that "the brothers who have access to the disorganized al-Furat Media and al-

Hayat Media Center channels will be able to organize them or give me access to them so that I would be able to organize them." Those are not the words of an unassociated or independent advocate. They are more suggestive of what Osadzinski had at that point become: a self-deputized IT servicer for the Islamic State.

Osadzinski highlights that at one point in June 2018 he declined Agent 3's invitation to connect with ISIS members. While true, Osadzinski explained that he did so only because he knew he was being watched by the FBI. As soon as he believed the surveillance had ended, he resumed coordination with ISIS. By August 2019, he proclaimed that "they gave up following me" so "now I am making as much jihad as possible." That comment, compounded by dozens of others like it, reflects Osadzinski's expressed intent to coordinate with ISIS.

Taken together, the totality of the record refutes Osadzinski's claim that he had no idea his conduct might violate § 2339B. Time and time again, Osadzinski took concrete action in direct response to ISIS's call for help to combat online censorship. He did so in attempted coordination with ISIS's official media bureau and members with the expressed intent for that coordination to deepen. Such conduct is inconsistent with independent advocacy and is proscribed by § 2339B.

In the final analysis, then, Osadzinski's vagueness challenge fails for the same core reason as his First Amendment claim: he attempted to engage in activity coordinated with or directed by a known foreign terrorist organization. Such activity is both unprotected by the First Amendment and clearly violative of § 2339B. We see no unconstitutional vagueness in allowing the material-support conviction to stand.

### III

Osadzinski directs his final challenge to the sufficiency of the evidence presented at his trial. He contends that the jury lacked an adequate basis to find him guilty because the evidence did not establish his specific intent to coordinate with or receive direction from ISIS.

Evidence is sufficient to support a conviction so long as "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt" after "viewing the evidence in the light most favorable to the prosecution." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); see also *United States v. Norwood*, 982 F.3d 1032, 1039 (7th Cir. 2020) (holding that a verdict should be overturned for insufficient evidence only if "the record contains no evidence, regardless of how it is weighted, from which the jury could have found guilt beyond a reasonable doubt"). We have interpreted this standard as creating a "nearly insurmountable hurdle" on the part of the defendant challenging the sufficiency of the evidence. *United States v. Johnson*, 874 F.3d 990, 998 (7th Cir. 2017) (cleaned up). Osadzinski cannot overcome it.

Viewed in the light most favorable to the government, the record contains sufficient evidence demonstrating Osadzinski's intent to act in coordination with or at the direction of ISIS. *Id.* Jurors saw messages Osadzinski sent to Agent 3 inviting him to connect him with ISIS brothers. They also heard testimony from Agent 2, who shared how Osadzinski taught him the computer program so he could relay the information back to ISIS members. And they read the Heralds of the Internet guide that Osadzinski authored, where he suggested that ISIS's media bureaus should give him access to their official channels for him to organize.

These statements provide a sufficient basis for a rational jury to conclude that Osadzinski aimed to coordinate his activity with ISIS. Indeed, the record indicates that such coordination was his overarching goal. As Osadzinski explained to Agent 3, by multiplying ISIS content online through his computer script, he hoped to distract Western intelligence agencies and give ISIS supporters more time to "plan[] attacks" without "being spied on."

The jury had a more than sufficient basis to conclude that Osadzinski provided services to ISIS, in coordination with ISIS, or under ISIS's direction.

## IV

At their core, Osadzinski's First Amendment, vagueness, and sufficiency challenges fail for the same overarching reason: his conduct, as proved by the evidence presented to the jury, went beyond constitutionally protected independent advocacy and crossed the line into prohibited concerted activity at the behest of a known foreign terrorist organization—ISIS. Osadzinski and the amicus raise important concerns about the challenge of drawing that line in a manner that respects the foundational right to free expression. While those concerns do not support reversal in this case, they will doubtless persist as future courts endeavor to chart the border between protected speech and material support. Today we simply decide that Thomas Osadzinski's conduct fell outside the protection of the First Amendment, unambiguously violated § 2339B, and permitted a reasonable jury to return a guilty verdict.

We AFFIRM.